# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

CHERYL OBERHAUS,         )
                                           )

      Plaintiff,              )
                                           )

      vs.                      )        **Case No. 4:11CV 1670 LMB**
                                           )

MICHAEL J. ASTRUE,         )
**Commissioner of Social Security,**    )
                                           )

      Defendant.         )

## MEMORANDUM

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Cheryl Oberhaus for Disability Insurance Benefits under Title II of the Social Security Act, and Supplemental Security Income under Title XVI of the Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. See 28 U.S.C. § 636(c). Plaintiff filed a Brief in support of the Complaint. (Doc. No. 14). Defendant filed a Brief in Support of the Answer. (Doc. No. 18).

## Procedural History

On September 4, 2008, plaintiff filed her application for benefits, claiming that she became unable to work due to her disabling condition on June 15, 2004. (Tr. 147-53). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated December 10, 2009. (Tr. 54-58, 8-17). Plaintiff then filed a request for review of the ALJ's decision with the Appeals Council of the

Social Security Administration (SSA), which was denied.[1]  (Tr. 4, 1-3).  Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.


**Evidence Before the ALJ**

A.     **ALJ Hearing**

Plaintiff's administrative hearing was held on November 16, 2009.  (Tr. 25).  Plaintiff was present and was represented by counsel.  (Id.).  Also present was vocational expert Thomas Dunleavy.  (Id.).

Plaintiff's attorney made an opening statement, in which he argued that plaintiff was disabled due to a series of injuries on the job to her ankle and knee.  (Tr. 28).  Plaintiff's attorney stated that plaintiff's pre-existing mental impairments were re-ignited following these injuries and continue to worsen.  (Id.).  He indicated that plaintiff was recently diagnosed with bipolar disorder,[2] mixed type; PTSD,[3] chronic; and panic disorder.[4]  (Id.).

---

[1]On June 2, 2011, the Appeals Council granted plaintiff's request for an additional twenty-five days in which to send more evidence or a statement about the facts and the law in her case. (Tr. 2).  Plaintiff was cautioned that, if the Appeals Council did not hear from her within that period, it would assume that she did not want to submit anything and would proceed to act on the record before it.  (Tr. 3).  There is no record of any additional materials submitted by plaintiff. The decision of the Appeals Council denying review is not contained in the record, although plaintiff indicates that she received a notice from the Appeals Council dated August 25, 2011. (Pl's Brief, p. 2).

[2]An affective disorder characterized by the occurrence of alternating manic, hypomanic, or mixed episodes and with major depressive episodes.  Stedman's Medical Dictionary, 568 (28th Ed. 2006).

[3]Development of characteristic long-term symptoms following a psychologically traumatic event that is generally outside the range of usual human experience; symptoms include persistently reexperiencing the event and attempting to avoid stimuli reminiscent of the trauma, numbed responsiveness to environmental stimuli, a variety of autonomic and cognitive dysfunctions, and

The ALJ examined plaintiff, who testified that she was forty-two years of age, and was single.  (Id.).  Plaintiff stated that she lived with another person in a mobile home.  (Tr. 29).  Plaintiff testified that she was five-feet, eight-inches tall, and weighed 158 pounds.  (Id.).  Plaintiff stated that she had a driver's license.  (Id.).  Plaintiff testified that she completed high school and took regular classes.  (Id.).  Plaintiff stated that she had not received any formal vocational training.  (Id.).

Plaintiff testified that she was not working at the time of the hearing, and that she last worked in May or June of 2004.  (Tr. 30).  Plaintiff stated that her last position was a nurse aide.  (Id.).  Plaintiff testified that she quit this job because she was unable to perform her duties due to her ankle injury and inability to focus.  (Id.).  Plaintiff stated that she received workers' compensation.  (Id.).

Plaintiff testified that she has worked as a housekeeper on a part-time basis.  (Tr. 31).  Plaintiff stated that she worked as a fast food worker on a full-time basis in the past.  (Id.).  Plaintiff testified that she had also worked full-time as an assembler in a factory.  (Id.).

Plaintiff stated that her right ankle swells.  (Tr. 32).  Plaintiff testified that she has tendonitis,[5] and her right arm occasionally locks.  (Id.).  Plaintiff stated that she also experiences lower back pain.  (Id.).

Plaintiff testified that her physical impairments affect her ability to perform basic work functions, such as standing and walking.  (Tr. 33).  Plaintiff stated that she is unable to sit for long

dysphoria.  See Stedman's at 570.

[4]Recurrent panic attacks that occur unpredictably.  Stedman's at 570.

[5]Inflammation of a tendon.  See Stedman's at 1946.

periods due to her lower back pain.  (Id.).  Plaintiff testified that she is unable to lift much weight due to her back pain.  (Id.).

Plaintiff stated that she was not receiving medical treatment for her physical conditions at the time of the hearing.  (Id.).  Plaintiff testified that she last received treatment in 2007 or 2008 through workers' compensation.  (Id.).  Plaintiff stated that she received injections, and was limited to light duty.  (Id.).

Plaintiff stated that she was taking Soma,[6] Vicodin,[7] Clonazepam,[8] and Bupropion[9] at the time of the hearing.  (Tr. 34).  Plaintiff testified that her medications help somewhat.  (Id.).  Plaintiff stated that she experiences side effects of drowsiness and clumsiness from her medications.  (Id.).  Plaintiff testified that she experiences these side effects all day, and she is unable to drive.  (Id.).  Plaintiff stated that the Clonazepam and Bupropion cause drowsiness. (Id.).

Plaintiff testified that, on a typical day, she wakes up at 8:30 or 9:00, drinks coffee, and takes her medication.  (Tr. 35).  Plaintiff stated that she then gets dressed, lounges around, and tries to do some laundry or other chores.  (Id.).  Plaintiff testified that cooks meals in the microwave.  (Id.).  Plaintiff stated that she listens to the radio, but does not watch television or

---

[6]Soma is indicated for the relief of discomfort associated with acute, painful musculoskeletal conditions.  See Physician's Desk Reference, ("PDR"), 1931 (63rd Ed. 2009).

[7]Vicodin is a narcotic analgesic indicated for the relief of moderate to moderately severe pain.  See PDR at 529.

[8]Clonazepam is indicated for the treatment of panic disorder.  See PDR at 2639.

[9]Bupropion is an antidepressant indicated for the treatment of major depressive disorder. See PDR at 1648-49.

use the computer.  (Tr. 36).  Plaintiff testified that she goes to bed between 7:30 and 8:00 p.m., after taking her medication.  (Id.).

Plaintiff stated that she is able to dress herself, and take care of her personal hygiene.  (Id.).  Plaintiff testified that she likes to have someone nearby when she gets out of the shower in case she trips.  (Id.).  Plaintiff stated that her girlfriend goes grocery shopping with her.  (Id.).  Plaintiff testified that she is able to wash dishes and sweep.  (Id.).  Plaintiff stated that she enjoys doing puzzles.  (Id.).

Plaintiff testified that she is unable to concentrate or focus due to her psychological impairments.  (Tr. 37).  Plaintiff stated that she sees a psychiatrist, who has diagnosed her with bipolar disorder, paranoia, panic attacks, and PTSD.  (Id.).

Plaintiff testified that she experiences panic attacks daily.  (Id.).  Plaintiff stated that she has four to five panic attacks a day, and that her panic attacks are worse if she does not take her medication.  (Tr. 38).  Plaintiff testified that her panic attacks last five to ten minutes when she takes her medication.  (Id.).  Plaintiff stated that her heart starts racing, she sweats, and she is unable to move during a panic attack.  (Id.).

Plaintiff testified that her psychological impairments prevent her from working due to the panic attacks, bipolar disorder, and anger issues.  (Id.).

Plaintiff stated that she started seeing her psychiatrist at Psych Consultants in 1998, but stopped seeing her at some point when she lost her insurance.  (Id.).  Plaintiff testified that she started seeing her psychiatrist again about one year prior to the hearing.  (Tr. 39).  Plaintiff stated that she sees her psychiatrist once a month for about five minutes, and that she receives medication.  (Id.).

- 5 -

Plaintiff stated that she also sees a therapist, Kim Dempsey. (Id.). Plaintiff testified that she has been seeing Dr. Dempsey every other week for about six months. (Tr. 40). Plaintiff stated that her therapy sessions last about one hour. (Id.). Plaintiff testified that the therapy helps "a little," but her psychiatrist has not helped her, and she was looking for a different psychiatrist. (Id.).

Plaintiff stated that she has no contact with her family. (Id.). Plaintiff testified that she has one friend, and that she sees this friend about every other day. (Id.). Plaintiff stated that her friend visits her at her home, and they sit down and talk. (Id.). Plaintiff testified that she started going to Church once a week about one month prior to the hearing. (Tr. 41).

Plaintiff stated that she has difficulty getting along with people when she goes out. (Id.). Plaintiff testified that she has never gotten along well with females. (Id.).

Plaintiff stated that she has difficulty concentrating. (Id.). Plaintiff testified that she is unable to finish tasks because she loses focus. (Id.).

Plaintiff stated that she experiences a sharp pain in her right ankle, and that her ankle occasionally swells. (Tr. 42).

Plaintiff testified that she experiences a sharp pain in her lower back that shoots down her right leg. (Id.). Plaintiff stated that her back pain comes and goes. (Id.). Plaintiff testified that she experiences back pain about half the time. (Id.).

Plaintiff stated that she experiences a constant burning pain in her elbow. (Tr. 43).

Plaintiff stated that her pain is worsened with physical activity. (Id.). Plaintiff testified that her pain is decreased somewhat when she applies heat. (Tr. 44).

Plaintiff stated that she was able to lift five to ten pounds. (Id.). Plaintiff testified that she

was able to walk a total of three to four hours in an eight-hour day. (Id.). Plaintiff stated that she was able to stand in one place for at least five minutes at a time, after which she would have to rest for about fifteen minutes before standing again. (Id.). Plaintiff testified that she would not be able to do this constantly for eight hours, but could stand for five minutes and then rest for fifteen minutes about four times in an eight-hour period. (Tr. 45). Plaintiff stated that she was able to sit for thirty minutes at a time, and that she could sit a total of about two hours in an eight-hour workday. (Id.).

Plaintiff testified that she never drove. (Id.). Plaintiff stated that she last drove in April of 2009. (Tr. 46). Plaintiff testified that the last time she drove, she had difficulty operating the steering wheel because her hand went numb. (Id.). Plaintiff stated that she also had difficulty with the pedals due to her coordination. (Id.).

Plaintiff's attorney next examined plaintiff, who testified that Dr. Foxen recently tested her right arm for ulnar palsy[10] because she was experiencing a burning sensation in her elbow and her arm was locking. (Tr. 47). Plaintiff stated that she was referred to an orthopedist, but she never heard back from him. (Id.). Plaintiff testified that she underwent surgery on her right elbow in 2000 for a different condition. (Id.). Plaintiff stated that she would consider surgery again if it would help. (Id.).

Plaintiff testified that she has difficulty lifting with her right arm. (Tr. 48). Plaintiff stated that she is unable to lift her five-pound dog. (Id.). Plaintiff testified that she brushes her teeth and combs her hair with her left hand because she is left-handed. (Id.).

The vocational expert, Thomas Dunleavy, questioned plaintiff, who testified that she lifted

---

[10]Paralysis of the ulnar nerve. See Stedman's at 1408.

mops and vacuums as a housekeeper. (Tr. 49). Plaintiff stated that she worked as a fast food

worker when she was in high school, which was more than fifteen years prior to the hearing.

(Id.). Plaintiff testified that, at her assembler position, she lifted boxes of calibers, although she

did not know how much they weighed. (Tr. 50).

The ALJ questioned plaintiff, who testified that she worked as a medical tech for two-and-

a-half months in 2007. (Tr. 51). Plaintiff stated that she cooked, cleaned, and dispensed

medications at this position. (Id.).

Mr. Dunleavy testified that plaintiff's past work as a nurse aid was semiskilled and

generally medium, but heavy as performed by plaintiff. (Id.). Mr. Dunleavy stated that plaintiff's

work as a housekeeper was unskilled and light. (Id.). Mr. Dunleavy testified that plaintiff's

assembler job was unskilled and light, but medium as performed by plaintiff. (Tr. 52).

Mr. Dunleavy testified that, if plaintiff's testimony were found to be fully credible,

plaintiff's four to five panic attacks a day would take her off even simple tasks and would

preclude competitive employment. (Id.). Mr. Dunleavy stated that he saw no limitations to

competitive work other than the panic attacks. (Id.).

## B.    Relevant Medical Records

The record reveals that plaintiff presented to Herbert A. Haupt, M.D., on March 27, 2006,

for an initial visit regarding a workers' compensation injury. (Tr. 79). Plaintiff reported right

ankle pain and right knee pain from two separate injuries. (Id.). Plaintiff indicated that she had a

previous knee injury in 2002, which resulted in surgery. (Id.). Upon examination of the right

knee, Dr. Haupt noted difficulty going into full active extension, marked quad atrophy, and

tenderness to palpation. (Id.). Examination of the right ankle revealed limited range of motion,

with no tenderness or effusion.  (Id.).  X-rays of the ankle were negative for acute bony changes and chronic changes; x-rays of the knee demonstrated well-maintained joint spaces and no acute or chronic bony changes.  (Tr. 80).  Dr. Haupt diagnosed plaintiff with chronic right ankle sprain syndrome, which was related to her work injury.  (Id.).  With regard to plaintiff's knee, Dr. Haupt stated that plaintiff probably sustained just a sprain to her knee but, because of disuse and perhaps compensating for her right ankle, she has developed marked atrophy and has lost active extension.  (Id.).  Dr. Haupt recommended an aggressive program of physical therapy for the ankle and the knee, use of a stabilizing brace for the knee, and an anti-inflammatory.  (Id.).  He restricted plaintiff to light duty, with no climbing activities, and standing and walking limited to thirty minutes per hour.  (Id.).

On April 20, 2006, plaintiff presented to Dr. Haupt for follow-up, at which time plaintiff complained of ongoing discomfort.  (Tr. 81).  Dr. Haupt stated that the physical therapy notes reveal that plaintiff had an "inconsistent presentation," plaintiff was uncooperative, and was noncompliant in therapy attendance.  (Id.).  Plaintiff had only attended one of eight scheduled physical therapy visits.  (Id.).  Plaintiff's physical examination remained unchanged.  (Id.).  Plaintiff had a "dramatic pain presentation," with limitations on range of motion of the knee.  (Id.).  Dr. Haupt found that plaintiff's subjective complaints were in excess of what her objective findings would suggest.  (Id.).  He stated there was evidence of contractures about the knee and the ankle that could only be benefitted by therapy.  (Id.).  Dr. Haupt recommended that plaintiff attend physical therapy, and maintain the same light duty program at work.  (Id.).

Plaintiff presented for follow-up on May 11, 2006, at which time Dr. Haupt indicated that plaintiff had seen clinical improvement with the therapy program.  (Tr. 82).  Plaintiff admitted to

marked improvement in her knee and some improvement, but not as significant, in her ankle. (Id.). Plaintiff complained only of soreness about her ankle. (Id.). Upon examination, plaintiff's ankle demonstrated some persistent decreased range of motion and soreness with range of motion, but no swelling. (Id.). Plaintiff's knee demonstrated near full active extension and flexion and less discomfort was noted. (Id.). Dr. Haupt's assessment was overall clinical improvement, even at this early date, from the physical therapy program. (Id.). He continued the physical therapy program and the light duty restriction. (Id.).

On July 6, 2006, Dr. Haupt noted that plaintiff had not attended a single physical therapy visit since her last evaluation due to alleged logistical considerations getting to physical therapy. (Tr. 83). Plaintiff complained of persistent discomfort about her ankle and indicated that she had visited the emergency room due to pain. (Id.). Dr. Haupt indicated that plaintiff's examination was benign. (Id.). Dr. Haupt diagnosed plaintiff with persistent subjective complaints with minimal objective findings on examination. (Id.). Dr. Haupt recommended an MRI scan of the ankle to rule out any occult injury patterns. (Id.).

On July 17, 2006, Dr. Haupt indicated that plaintiff had undergone an MRI of the right ankle, which revealed findings consistent with tendinopathy of the posterior tibial tendon and the flexor tendons of the flexor digitorum longus and hallucis. (Tr. 84). Some mild bone marrow edema in the medial aspect of the talus[11] was also noted. (Id.). Plaintiff still had symptomatic complaints about the entire ankle, although most of her soreness was in the medial aspect of the ankle. (Id.). Upon examination, plaintiff had full passive range of motion. (Id.). Dr. Haupt

---

[11]The bone of the foot that articulates superiorly with the tibia and fibula to form the ankle joint. Stedman's at 1934.

indicated that he had reviewed plaintiff's MRI scan, and the area of the bone contusion appeared to be very subtle and was probably representative of an old contusion that was well on its way to healing.  (Id.).  Dr. Haupt's assessment was that plaintiff's work injury likely resulted in some mild bony contusion to the talus which was on its way to healing.  (Id.).  Dr. Haupt found that the tendinopathy was probably the result of compensation and altered gait.  (Id.).  Dr. Haupt recommended that plaintiff return to physical therapy, and wear a lace-up support brace.  (Id.).

In a note dated August 21, 2006, Dr. Haupt stated that he received a letter on that date advising him that plaintiff did not attend any visits in physical therapy after her last appointment on July 17, 2006.  (Tr. 85).  Dr. Haupt stated that, because plaintiff was unwilling to participate in the recommended treatment program, he was considering her at maximum medical improvement and released her from his care.  (Id.).  Dr. Haupt further found that plaintiff should be allowed to attempt to return to full duties at work without restrictions.  (Id.).

Plaintiff presented to Lyndon B. Gross, M.D., at the Orthopedic Center of St. Louis, on September 28, 2006, for evaluation of her right ankle and right knee.  (Tr. 65-67).  Plaintiff complained of pain in the medial aspect of the ankle, and the anterior aspect of her knee.  (Tr. 65).  Upon examination, plaintiff complained of some pain with range of motion of her right knee in the anterior aspect, and some tenderness to palpation.  (Tr. 66).  Examination of the right ankle revealed some tenderness to palpation over the medial aspect, and no swelling.  (Id.).  Dr. Gross' impression was right ankle posterior tibial tendonitis and right knee pain.  (Tr. 67).  Dr. Gross noted that plaintiff had some symptom magnification when he tried to examine both her ankle and her knee.  (Id.).  Dr. Gross stated that it was not unreasonable to make sure that there was nothing significantly wrong with plaintiff's knee or ankle prior to releasing her from medical care.

(Id.).  Dr. Gross referred plaintiff to Dr. Krause, a foot and ankle specialist, for further evaluation with regard to her ankle.  (Id.).  Dr. Gross administered a steroid injection to plaintiff's knee. (Id.).  Dr. Gross indicated that he was unsure of the etiology of plaintiff's knee pain.  (Id.).  Dr. Gross stated that he did not think surgical intervention was necessary at that time.  (Id.).  Dr. Gross restricted plaintiff to avoiding squatting and kneeling until she returns.  (Id.).

Plaintiff presented to Dr. Gross for follow-up regarding her knee pain on October 16, 2006.  (Tr. 69).  Plaintiff reported that the steroid injection provided no relief.  (Id.).  Upon examination, plaintiff complained of pain with range of motion of her knee, mostly over the anterior aspect of the knee.  (Id.).  Dr. Gross' impression was right knee pain.  (Id.).  Dr. Gross stated that he was unsure of the reason for plaintiff's continued pain.  (Id.).  Dr. Gross indicated that there was "some significant symptom magnification on any attempts at examination of her knee," and he was unsure whether there was any significant pathology in her knee that would require further evaluation.  (Tr. 70).  Dr. Gross released plaintiff from his care with regard to her knee, and recommended that she do home exercises.  (Id.).

Plaintiff presented to John O. Krause, M.D. on October 16, 2006, for evaluation of her right ankle.  (Tr. 71).  Plaintiff reported that she tripped over a mat on the ground while working at a factory two to three years prior and rolled her ankle.  (Id.).  Upon examination, Dr. Krause noted "marked symptom magnification" regarding her right lower extremity.  (Id.).  Dr. Krause was unable to assess her ankle or hindfoot motion because of her magnified symptoms.  (Id.).  Dr. Krause's assessment was right hindfoot pain with significant symptom magnification.  (Tr. 72). Dr. Krause stated that his "gut instinct" was that plaintiff "did not have overt pathology,"

although he would hold final judgment until he saw her MRI films. (Id.). Dr. Krause found no reason why plaintiff could not perform full duty. (Id.).

Plaintiff presented to Dr. Krause on November 27, 2006, with complaints of worsening right hindfoot pain. (Tr. 397). Upon examination, Dr. Krause noted minimal swelling and tenderness. (Id.). Dr. Krause's impression was right medial hindfoot pain with symptom magnification. (Id.). Dr. Krause indicated that he needed to see plaintiff's MRI before initiating any treatment. (Id.). On November 29, 2006, Dr. Krause indicated that he had reviewed plaintiff's MRI, and it clearly shows degeneration in the posterior tibial tendon with some fluid around the tendon. (Id.). Dr. Krause's assessment was right posterior tibial tendon dysfunction. (Id.). Dr. Krause recommended a tendon sheath injection. (Id.). He found that plaintiff could work full duty with no restrictions. (Id.). On December 11, 2006, Dr. Krause indicated that plaintiff had undergone a tibial tendon sheath injection and she reported that it did not provide relief. (Tr. 395). Plaintiff was unwilling to bear weight on her heel, so it was difficult to assess whether she had a deformity. (Id.). Dr. Krause indicated that he would consider a surgical procedure if plaintiff did not obtain long-term relief from steroid injections. (Id.). Dr. Krause found that plaintiff had no work restrictions. (Id.). On December 29, 2006, plaintiff reported that she got absolutely no relief from the injection. (Tr. 393). Plaintiff was weight-bearing in a CAM walker and still reported pain with most weight-bearing activities. (Id.). Upon examination, plaintiff had tenderness along her posterior tibial tendon sheath, and was unwilling to put full weight on her right lower extremity. (Id.). Dr. Krause's assessment was right posterior tibial tendon dysfunction, cannot rule out tear. (Id.). Dr. Krause recommended a repeat MRI, and possibly surgery. (Id.). Dr. Krause indicated that plaintiff could perform sitting work with

intermittent standing no more than thirty minutes. (Tr. 394).

Judith McGee, Ph.D. completed a Psychiatric Review Technique on January 4, 2007, in which she expressed the opinion that plaintiff had no medically determinable impairment. (Tr. 379).

On January 8, 2007, Dr. Krause indicated that plaintiff's MRI revealed minimal fluid around the posterior tibial tendon, and no tendon tear. (Tr. 392). Dr. Krause's assessment was right posterior tibial tenosynovitis[12] without evidence of tear. (Id.). Dr. Krause stated that, given plaintiff's "near normal MRI," he would not recommend any surgical intervention. (Id.). Dr. Krause indicated that he had no satisfactory recommendations for plaintiff, and that she should see Dr. Tim Noonan for a second opinion. (Id.). Dr. Krause found that plaintiff could perform sitting work with intermittent standing no more than sixty minutes. (Id.). In a noted dated February 21, 2007, Dr. Krause indicated that plaintiff saw Dr. Tim Noonan for a second opinion, and Dr. Noonan does not feel that plaintiff has any substantial pathology that needs any type of surgical intervention. (Tr. 391). Dr. Krause's assessment was right hindfoot pain of unknown etiology. (Id.). Dr. Krause stated that plaintiff did not need any type of treatment and was at maximum medical improvement. (Id.). Dr. Krause found that plaintiff could work full duty with no restrictions. (Id.).

Plaintiff presented to Manish Suther, M.D., at Pain Prevention & Rehabilitation Center on February 27, 2008, with complaints of pain and numbness in the right foot and ankle. (Tr. 410). Upon examination, plaintiff ambulated with a mild limp secondary to her right foot and ankle pain. (Tr. 412). Dr. Suther diagnosed plaintiff with chronic right foot and ankle pain with possibly

---

[12]Inflammation of a tendon and its enveloping sheath. Stedman's at 1946.

sympathetic mediated pain; and anxiety disorder that seems to amplify her physical complaints. (Id.). Dr. Suther indicated that there was no structural basis for ongoing pain. (Id.). He recommended neuroleptic medications for plaintiff's sympathetic mediated pain. (Id.). Dr. Suther stated that there was no objective basis to refrain plaintiff from working, and indicated that plaintiff may continue working with no restrictions at full duty. (Tr. 411). Dr. Suther found that plaintiff's prognosis was poor. (Id.).

Plaintiff saw Dr. Suthar on April 21, 2008 for follow-up, at which time she reported that the Elavil was not well-tolerated and had no effect on her pain. (Tr. 408). Dr. Suthar's impression was chronic right foot and ankle pain possibly sympathetic mediated pain;[13] and a component of anxiety and depression associated with chronic pain. (Id.). Dr. Suthar discontinued the Elavil[14] and started plaintiff on a trial of Lyrica.[15] (Id.). On May 19, 2008, Dr. Suthar indicated that plaintiff had not tolerated any of the neuroleptic medications and was no better than when she started. (Tr. 407). Plaintiff continued to experience panic attacks, which then fuel her foot pain further. (Id.). Dr. Suthar found that plaintiff was at maximum medical improvement, and recommended that plaintiff see a psychiatrist to treat the anxiety and panic attacks that she experiences. (Id.).

Plaintiff presented to Wayne A. Stillings, M.D., Assistant Professor of Clinical Psychiatry at Washington University School of Medicine, on June 24, 2008, for a psychiatric independent

---

[13]Pain related to the sympathetic nervous system, which is the part of the nervous system controlling involuntary or unconscious functions of the body. See Stedman's at 1928.

[14]Elavil is an antidepressant indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited September 21, 2012).

[15]Lyrica is indicated for the treatment of neuropathic pain. See PDR at 2527.

medical examination. (Tr. 415-25). Plaintiff reported that she becomes moody and experiences panic attacks when her foot pain becomes unbearable. (Tr. 416). Plaintiff stated that, during a panic attack, she experienced shortness of breath, diaphoresis, and she felt "magnetized to the floor." (Id.). Plaintiff indicated that she actually lies down on the floor and cannot get up during a panic attack. (Id.). Plaintiff reported that she had returned to work in the summer of 2006 as a housekeeper, but quit this position because she developed a baker's cyst behind her right knee. (Tr. 417). Plaintiff indicated that she worked as a medical technician at a residential care facility in April 2007 but quit to help her mother take care of her sister's children after her sister committed suicide. (Id.). Plaintiff reported that she spends three entire days per week with her mother caring for the children. (Tr. 418). Plaintiff lived with her boyfriend and her two younger children, who were aged fifteen and thirteen. (Id.). Plaintiff's seventeen-year-old son lived with plaintiff's mother. (Id.). Plaintiff assisted with the daily care of her boyfriend's father, who was ill with multiple medical problems. (Id.). Upon mental status examination, plaintiff displayed significant psychological distress regarding her sister's suicide and her ex-boyfriend's extensive abuse, but her affect was pleasant overall. (Tr. 421). Plaintiff was described as a "cheerful person," and her mood was euthymic. (Id.). Plaintiff was not clinically depressed nor manic. (Id.). Plaintiff displayed a good sense of humor and left the impression that she was a rather happy individual. (Id.). Plaintiff's memory functions, insight, and judgment were intact. (Id.). Plaintiff's intellectual function was in the normal range. (Id.). Dr. Stillings administered the MMPI and MCMI-III. (Tr. 422-24). Dr. Stillings also administered the SIMS test, which revealed that plaintiff was overreporting neurologic symptoms and depressive subjective symptoms. (Tr. 424). Dr. Stillings diagnosed plaintiff with dysfunctional family of origin, parent-

child relational problem, partner-relational problem, bipolar II disorder, panic disorder, parent-child relational problem, sibling relational problem, and personality disorder NOS with passive-aggressive, borderline, schizoid, and avoidant personality traits. (Tr. 424). Dr. Stillings assessed a GAF[16] score of 55.[17] (Id.). Dr. Stillings found that plaintiff was at psychiatric maximum medical improvement and does not need additional psychiatric treatment. (Tr. 425). Dr. Stillings expressed the opinion that, from a psychiatric standpoint, plaintiff was able to work without psychiatric restrictions, limitations, or accommodations. (Id.).

Kyle DeVore, Ph.D. completed a Psychiatric Review Technique on October 17, 2008, in which he expressed the opinion that plaintiff's impairments were not severe and resulted in only mild difficulties in activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 440).

Plaintiff presented to John M. Laird, M.D. on December 29, 2008, with complaints of panic attacks, chest pain, difficulty sleeping, and right ankle pain. (Tr. 449). Dr. Laird diagnosed plaintiff with "anxiety and tension state," pain, and history of panic attacks. (Id.). Dr. Laird prescribed Zoloft.[18] (Id.). On January 19, 2009, plaintiff complained of right ankle pain after

---

[16]The Global Assessment of Functioning Scale (GAF) is a psychological assessment tool wherein an examiner is to "[c]onsider psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness" which does "not include impairment in functioning due to physical (or environmental) limitations." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

[17]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[18]Zoloft is an antidepressant indicated for the treatment of depression and other mood disorders. See WebMD, http://www.webmd.com/drugs (last visited September 21, 2012).

being involved in a car accident two days prior. (Tr. 450). Dr. Laird prescribed Elavil, and Vicodin. (Id.).

Plaintiff presented to Psych Care Consultants on February 3, 2009, at which time it was noted that plaintiff had been diagnosed with bipolar disorder and generalized anxiety disorder[19] in 1998, but did not remain compliant with medication and had been out of medication for the past ten years. (Tr. 444). Plaintiff reported feeling depressed and moody, and experiencing daily panic attacks. (Id.). Plaintiff's affect was described as labile, and her mood was depressed and anxious. (Tr. 445). Plaintiff was diagnosed with history of bipolar disorder, history of PTSD with psychotic features, history of personality disorder, and a GAF score of 55. (Id.). Plaintiff was started on a trial of Zyprexa.[20] (Id.).

Plaintiff presented to Dr. Laird on March 5, 2009, at which time it was noted that plaintiff was doing well after a death. (Tr. 451). Plaintiff was still on medication but needed to sleep. (Id.). Dr. Laird indicated that plaintiff may be getting off the other medications, but only time will tell. (Id.).

Plaintiff presented to Dr. Laird on April 28, 2009, with complaints of low back pain. (Tr. 452). Dr. Laird noted that plaintiff's pain was musculoskeletal, and that heat and range of motion exercises were needed. (Id.).

Plaintiff presented to Psych Care Consultants on June 7, 2009, with complaints of experiencing panic attacks and feeling more depressed. (Tr. 447). Plaintiff was diagnosed with

---

[19]A psychological disorder in which anxiety or morbid fear and dread accompanied by autonomic changes are prominent features. Stedman's at 569.

[20]Zyprexa is a psychotropic drug indicated for the treatment of schizophrenia and bipolar disorder, and agitation associated with schizophrenia and bipolar I mania. See PDR at 1884-85.

bipolar disorder, mixed episode.  (Id.).  Plaintiff's Zyprexa was discontinued and plaintiff was started on Seroquel.[21]  (Id.).

Plaintiff presented to John Foxen, M.D. at Midwest Behavioral Health on June 8, 2009, with complaints of lower back pain, which was radiating to the thighs.  (Tr. 469).  Plaintiff reported that her pain started after she was involved in a motor vehicle accident on May 29, 2009.  (Id.).  Upon examination, plaintiff was noted to be agitated and anxious.  (Tr. 471).  Dr. Foxen diagnosed plaintiff with low back pain, intermittent right arm pain and stiffness, fatigue, and anxiety state.  (Id.).

Plaintiff presented to Dr. Foxen on July 1, 2009, for follow-up regarding tendonitis, and pain and numbness of the right arm.  (Tr. 473).  Plaintiff reported a burning pain in her right elbow for two months.  (Id.).  Plaintiff had a history of ulnar palsy.  (Id.).  Upon examination, plaintiff was agitated, anxious, and fearful.  (Tr. 475).  Dr. Foxen diagnosed plaintiff with pain in the right elbow for two months, and anxiety state.  (Id.).  Dr. Foxen ordered additional testing.  (Tr. 476).  Plaintiff presented to Dr. Foxen on July 15, 2009, at which time she reported worsening right arm pain.  (Tr. 477).  Dr. Foxen's assessment was pain in limb, right ulnar nerve entrapment, and anxiety state.  (Tr. 479).

Plaintiff presented to psychologist Kim Dempsey, Psy.D. on July 30, 2009 for individual therapy.  (Tr. 466).  Plaintiff reported depressed mood, irritability, and anxiety.  (Id.).  Plaintiff also reported some decrease in panic symptoms since her physician prescribed some anxiety medication.  (Id.).  Dr. Dempsey diagnosed plaintiff with bipolar I disorder, severe; PTSD,

---

[21]Seroquel is indicated for the treatment of bipolar disorder and schizophrenia.  See WebMD, http://www.webmd.com/drugs (last visited September 21, 2012).

chronic; panic disorder; and assessed a GAF score of 50.[22]  (Id.).  Dr. Dempsey discussed coping

skills with plaintiff.  (Id.).  On August 7, 2009, plaintiff reported increased anger outbursts,

irritability, and panic symptoms.  (Tr. 467).  Plaintiff discussed memories of being physically

abused by her parents.  (Id.).  Dr. Dempsey assessed a GAF score of 45.  (Id.).  She discussed

coping skills and encouraged better medication compliance.  (Id.).

Plaintiff presented to Dr. Foxen on August 21, 2009, with complaints of bilateral elbow

pain and locking, and back pain.  (Tr. 482).  Plaintiff's psychiatric examination revealed plaintiff

was agitated, anxious, fearful, had flight of ideas, mood swings, and poor attention span and

concentration.  (Tr. 484).  Dr. Foxen diagnosed plaintiff with low back pain, and bipolar disorder.

(Tr. 484-85).

Plaintiff saw Dr. Dempsey on August 24, 2009, at which time plaintiff reported continued

depressed mood, irritability, and anxiety.  (Tr. 468).  Plaintiff reported some reduction in mood

symptoms due to being prescribed Tegretol[23] by her family care physician.  (Id.).  Dr. Dempsey's

diagnosis remained unchanged.  (Id.).

Plaintiff presented to Dr. Foxen on September 10, 2009, with complaints of mood swings.

(Tr. 492).  Plaintiff reported that she had stopped taking Tegretol because it made her dizzy and

disoriented, with hallucinations.  (Id.).  Upon examination, plaintiff was agitated, anxious, fearful,

had flight of ideas, mood swings, and poor attention span and concentration. (Tr. 495).  Dr.

---

[22]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in
social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV at
32.  A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial
speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school
functioning (e.g., few friends, conflicts with peers or co-workers)."  Id. at 32.

[23]Tegretol is indicated for the treatment of trigeminal neuralgia.  See PDR at 3019.

Foxen diagnosed plaintiff with bipolar disorder and anxiety state.  (Id.).  He increased plaintiff's Clonazepam.  (Id.).

Dr. Dempsey completed a Mental Residual Functional Capacity Questionnaire on November 9, 2009.  (Tr. 508-12).  Dr. Dempsey indicated that she had seen plaintiff on five occasions for a diagnosis of bipolar I disorder, mixed.  (Tr. 508).  Dr. Dempsey stated that plaintiff's condition had not improved since her initial assessment.  (Id.).  Dr. Dempsey expressed the opinion that plaintiff was unable to meet competitive standards in the areas of completing a normal workday and workweek without interruptions from psychologically-based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and dealing with normal work stress.  (Tr. 509).  Dr. Dempsey stated that plaintiff's depressive symptoms and irritability would likely interfere with her ability to interact appropriately in a work setting and deal with work stress. (Tr. 510).  Dr. Dempsey also found that plaintiff was unable to meet competitive standards in her ability to interact appropriately with the general public and maintain socially appropriate behavior.  (Id.).  Dr. Dempsey stated that plaintiff's "irritability, anger outbursts, and impulsivity limit her social and work functioning, as reported by client." (Id.).  Dr. Dempsey indicated that plaintiff's depressive symptoms and irritability may exacerbate her experience of pain or physical symptoms.  (Tr. 511).  Finally, Dr. Dempsey stated that plaintiff "presents with severe mood symptoms which appear to limit her social and occupational functioning."  (Id.).

## The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2009.

2. The claimant has not engaged in substantial gainful activity since June 15, 2004, the alleged onset date (20 CFR 404.1571 *et seq.*, and 20 CFR 416.971 *et seq.*).

3. The claimant has the following severe impairments: Right Ankle Tendonitis; Right Knee Pain; Bipolar Disorder (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except the claimant is limited to unskilled work.

6. The claimant is capable of performing past relevant work as a Housekeeper, Fast Food Worker, Nurse Aide. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2004, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

(Tr. 10-16).

The ALJ's final decision reads as follows:

Based on the application for a period of disability and disability insurance benefits protectively filed on September 3, 2008, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

Based on the application for supplemental security income filed on September 4, 2008, the claimant is not disabled under section 1614(a)(3)(A) of the Social Security Act.

(Tr. 17).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision.  See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary."  Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry." Id.

### B.    The Determination of Disability

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d

598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998).  First, it is determined whether the claimant is currently engaged in "substantial gainful employment."  If the claimant is, disability benefits must be denied. See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c), 416.920 (c).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the

claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience. See 20 C.F.R. §§ 404.1520 (f), 416.920 (f). The claimant is entitled to disability benefits only if s/he is not able to perform any other work. See id. Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work. See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments. See 20 C.F.R. §§ 404.1520a (a), 416.920a (a). A special procedure must be followed at each level of administrative review. See id. Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required. See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758. Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council. See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

## C.    Plaintiff's Claims

Plaintiff first argues that the ALJ erred in determining plaintiff's residual functional capacity. Plaintiff next argues that the ALJ erred in finding plaintiff capable of performing her past relevant work. The undersigned will discuss plaintiff's claims in turn.

**1.     Residual Functional Capacity**

Plaintiff argues that the ALJ failed to point to some medical evidence in support of his

RFC determination, as required under the standards contained in Singh and Lauer.  Plaintiff also

contends that the ALJ erred in discrediting the opinion of treating psychologist Dr. Dempsey in

determining plaintiff's RFC.

The ALJ made the following determination regarding plaintiff's RFC:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform medium work as defined
> in 20 CFR 404.1567(c) and 416.967(c) except the claimant is limited to unskilled   work.

(Tr. 12).

A disability claimant's RFC is the most he or she can still do despite his or her limitations.

20 C.F.R. § 404.1545(a)(1).  In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc),

the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day

out, in the sometimes competitive and stressful conditions in which real people work in the real

world."  Id. at 1147.  The ALJ's determination of an individual's RFC should be "based on all the

evidence in the record, including 'the medical records, observations of treating physicians and

others, and an individual's own description of his limitations.'"  Krogmeier v. Barnhart, 294 F.3d

1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although assessing a claimant's RFC is primarily the responsibility of the ALJ, a

"'claimant's residual functional capacity is a medical question.'"  Lauer v. Apfel, 245 F.3d 700,

704 (quoting Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000)).  The Eighth Circuit clarified in

Lauer, 245 F.3d at 704, that "'[s]ome medical evidence,' Dykes v. Apfel, 223 F.3d 865, 867 (8th

Cir. 2000) (per curiam), must support the determination of the claimant's RFC, and the ALJ

should obtain medical evidence that addresses the claimant's 'ability to function in the workplace,' Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000)." Thus, an ALJ is "required to consider at least some supporting evidence from a professional." Id. See also Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010) ("The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC."); Eichelberger, 390 F.3d at 591.

In determining plaintiff's RFC, the ALJ first assessed the credibility of plaintiff's subjective complaints of pain and limitation. "While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley v. Callahan, 133 F.3d 583, 588 (8th Cir. 1998). Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints. Id. The ALJ may discount subjective complaints of pain if inconsistencies are apparent in the evidence as a whole. Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998).

The ALJ properly pointed out the Polaski factors and other inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. (Tr. 12-14). The ALJ first discussed plaintiff's daily activities. The ALJ noted that plaintiff performs household chores, prepares meals, shops with a friend, and visits with a friend every other day. (Tr. 13, 36, 40). In addition, plaintiff reported to consultative examiner Dr. Stillings in June 2008 that she spends three full days a week helping her mother take care of her deceased sister's children, and that she cared for her own two younger children. (Tr. 417). Plaintiff also reported that she assisted with the daily care of her boyfriend's father, who was ill. (Tr. 418). Significant daily activities may be inconsistent with claims of disabling pain. See Haley v. Massanari, 258 F.3d 742, 748 (8th Cir. 2001).

Further, the ALJ noted that plaintiff reported to Dr. Stillings that she quit her most recent work attempt in 2007 not as a result of her impairments, but because she wanted to assist in the care of her sister's children. (Tr. 13, 417). The ALJ properly found that this fact detracts from plaintiff's credibility and indicates plaintiff's potential ability to continue working. (Tr. 13). See Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (ALJ may consider the fact that claimant left work for reasons other than a medical condition when considering the credibility of plaintiff's subjective complaints).

The ALJ next pointed out that the medical evidence of record reflects symptom exaggeration by plaintiff and the failure to attend medical appointments. (Tr. 13). In April 2006, Dr. Haupt indicated that plaintiff was uncooperative and noncompliant in physical therapy attendance, attending only one of eight scheduled visits. (Tr. 81). Dr. Haupt also found that plaintiff's subjective complaints were in excess of the objective findings on examination. (Id.). In August 2006, Dr. Haupt discharged plaintiff from his care, noting that plaintiff had not attended

any physical therapy visits and was unwilling to participate in the recommended treatment program. (Tr. 85). Dr. Haupt found that plaintiff could return to full duties at work without restrictions. (Id.). In September 2006, orthopedist Dr. Gross noted evidence of symptom magnification when he tried to examine plaintiff's ankle and knee. (Tr. 67). In October 2006, Dr. Gross indicated that there was significant symptom magnification and he was unsure whether there was any significant pathology in plaintiff's knee. (Tr. 70). Dr. Gross released plaintiff from his care. (Id.). On the same date, Dr. Krause noted "marked symptom magnification" regarding plaintiff's right lower extremity. (Tr. 71). The ALJ accurately noted the significant evidence in the medial record of symptom exaggeration and noncompliance, and found that it detracted from plaintiff's credibility.

After properly assessing plaintiff's credibility, the ALJ discussed the medical opinion evidence. The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. Id. Normally, the opinion of the treating physician is entitled to substantial weight. Casey v. Astrue, 503 F.3d 687, 691 (8th Cir. 2007). The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. Singh, 222 F.3d at 452. The opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician. 20 C.F.R. § 404.1527(d)(1).

Plaintiff argues that the ALJ erred in discrediting the opinion of treating psychologist Dr. Dempsey. Dr. Dempsey completed a Mental Residual Functional Capacity Questionnaire on November 9, 2009. (Tr. 508-12). Dr. Dempsey expressed the opinion that plaintiff was unable to

meet competitive standards in the areas of completing a normal workday and workweek without interruptions from psychologically-based symptoms, accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, dealing with normal work stress, interacting appropriately with the general public, and maintaining socially appropriate behavior. (Tr. 509).

The ALJ discussed the opinion of Dr. Dempsey at length and concluded that he would assign the opinion "little weight." (Tr. 15). The ALJ first noted that Dr. Dempsey indicated that she had recently begun treating plaintiff, and had seen her on only five visits over the course of fewer than three months. (Tr. 15, 508). The ALJ stated that Dr. Dempsey in her questionnaire as well as her treatment notes appears to base her opinions largely on the subjective complaints of plaintiff. (Tr. 15). The ALJ noted that plaintiff's subjective complaints have been found to be exaggerated. (Id.). The ALJ stated that, while Dr. Dempsey's diagnosis of bipolar disorder may be correct, her analysis of plaintiff's mental functional capacity is not consistent. (Id.). The ALJ pointed out that Dr. Dempsey's assessment was predominately a standard fill-in-the-blank questionnaire without much narrative explanation, and was accordingly entitled to little weight. (Id.). The ALJ acknowledged that Dr. Dempsey is a treating source, but noted that treating doctors occasionally provide opinions to satisfy their patient's requests. (Id.). Finally, the ALJ stated that Dr. Dempsey's opinion departs substantially from the rest of the evidence of record. (Id.).

The undersigned finds that the ALJ properly evaluated Dr. Dempsey's opinion. "[W]hile a treating physician's opinion is generally entitled to substantial weight, such an opinion does not automatically control because the [ALJ] must evaluate the record as a whole." Wagner v. Astrue,

499 F.3d 842, 849 (8th Cir. 2007). The ALJ acknowledged that Dr. Dempsey was plaintiff's treating psychologist, but accurately pointed out that Dr. Wagner had only been treating plaintiff for a short time when she provided her opinion.

The ALJ found that Dr. Dempsey's opinion appeared to be based primarily on plaintiff's subjective complaints. This finding is supported by a statement contained in Dr. Dempsey's questionnaire. When asked to explain her findings regarding plaintiff's work-related limitations, Dr. Dempsey stated that plaintiff's "irritability, anger outbursts, and impulsivity limit her social and work functioning, *as reported by client.*" (Tr. 510) (emphasis added). In addition, Dr. Dempsey's treatment notes primarily document plaintiff's subjective complaints. (Tr. 466, 468). As previously discussed, the ALJ properly found that plaintiff's subjective complaints of pain and limitation were not credible. Thus, it was proper for the ALJ to point out that Dr. Dempsey's opinion appeared to be based upon plaintiff's subjective complaints.

The ALJ also found that Dr. Dempsey's opinion was inconsistent with the rest of the record. The ALJ pointed out that Dr. Stillings examined plaintiff in June 2008 and, after performing several psychological tests, diagnosed plaintiff with multiple psychiatric disorders, including bipolar disorder. (Tr. 16, 424). Dr. Stillings, however, expressed the opinion that plaintiff required no additional treatment and was able to work without psychiatric restrictions, limitations, or accommodations. (Tr. 425).

The ALJ indicated that he was according weight to Dr. Stillings' opinion. (Tr. 16). Physician opinions that are supported by more or better medical evidence may be used to discredit the opinions of treating physicians. Teague v. Astrue, 638 F.3d 611, 615 (8th Cir. 2011). Dr. Stillings' opinion was supported by his findings on examination, which revealed a pleasant affect, euthymic mood, no evidence of depression or mania, a good sense of humor, intact memory,

intact insight and judgment, and a normal intellectual function. (Tr. 421). Psychological testing performed by Dr. Stillings indicated that plaintiff was overreporting depressive subjective symptoms. (Tr. 424). In addition, as previously mentioned, plaintiff reported to Dr. Stillings that she quit her last job to help her mother take care of her sister's children, she spent three full days a week helping care for her sister's children, she took care of her own two younger children, and she assisted with the daily care of the ill father of her boyfriend. (Tr. 416-18). Plaintiff's reported activities are consistent with Dr. Stillings' opinion that plaintiff's mental impairments did not result in work limitations.

In sum, the ALJ provided sufficient reasons for discrediting the opinion of Dr. Dempsey. Dr. Dempsey's opinion appeared to be based on plaintiff's subjective complaints, which the ALJ found were not credible. The ALJ concluded that, while Dr. Stillings and the state agency psychologist found that plaintiff had no psychiatric restrictions, the record supported a restriction to unskilled work. (Tr. 16). The ALJ, therefore, incorporated greater restrictions in his RFC than those found by Dr. Stillings and the state agency psychologist. The ALJ did not dispute that plaintiff suffered from bipolar disorder, but found that the record as a whole was not supportive of disabling symptoms. In doing so, the ALJ properly weighed the medical opinion evidence and determined a RFC supported by the record as a whole.

With regard to plaintiff's physical impairments, the ALJ found that plaintiff was capable of performing medium work. (Tr. 12). In support of this determination, the ALJ first noted that the objective medical findings were inconsistent with total disability. (Tr. 14). The ALJ pointed out that x-rays of plaintiff's right knee and right ankle performed in September 2006 did not indicate any significant results. (Tr. 14, 80). The ALJ also indicated that plaintiff underwent an MRI of her right ankle in 2006, which demonstrated moderate tendonopathy of the posterior tibial tendon,

fluid in the tendon sheath, very mild bone edema, no fractures, and intact ligamentous structures. (Tr. 84, 392).

With regard to the medical opinion evidence, the ALJ indicated that he was assigning "great weight" to the opinions of orthopedic specialists Drs. Gross and Krause. (Tr. 14-15). On October 2006, Dr. Gross found that plaintiff could return to regular duty and required no further treatment at that time. (Tr. 361). Significantly, Dr. Gross noted evidence of symptom magnification on the part of plaintiff. (Tr. 70). Dr. Krause also noted "marked symptom magnification" regarding plaintiff's right lower extremity. (Tr. 71). On February 21, 2007, Dr. Krause diagnosed plaintiff with right hindfoot pain of unknown etiology. (Tr. 391). Dr. Krause expressed the opinion that plaintiff did not require any treatment and could work full duty with no restrictions. (Id.). The ALJ noted that these opinions were entitled to great weight because they were provided by specialists and were consistent with the providers' treatment notes and the weight of the medical evidence of record. (Tr. 14-15).

The physical RFC formulated by the ALJ is consistent with the objective medical evidence. Plaintiff's treating orthopedists both noted evidence of symptom magnification and expressed the opinion that plaintiff was capable of returning to work with no limitations. The ALJ performed a proper credibility analysis and found that plaintiff's subjective allegations were not credible. Thus, the RFC determined by the ALJ is supported by substantial evidence in the record as a whole.

## 2.      Past Relevant Work

The ALJ determined that plaintiff was capable of performing past relevant work as a housekeeper, fast food worker, and nurse aide. (Tr. 16). Plaintiff argues that the ALJ's determination is improper because he failed to complete a function-by-function analysis as required by Pfitzner v. Apfel, 169 F.3d 566 (8th Cir. 1999). Plaintiff also argues that plaintiff's

past job as a fast food worker was eliminated by the ALJ at the hearing because it was performed more than fifteen years prior to the hearing.

Under Pfitzner, the ALJ must make specific findings as to the claimant's limitations and the effect of those limitations on the claimant's residual functional capacity. Id. at 568. The ALJ should then "make explicit findings regarding the actual physical and mental demands of the claimant's past work." Id. at 569 (quoting Groeper v. Sullivan, 932 F.2d 1234, 1239 (8th Cir. 1991)). The ALJ may discharge this duty by referring to the specific job descriptions in the Dictionary of Occupational Titles that are associated with the claimant's past work. Id. But, if after a careful review of the record, the court determines that a remand for the ALJ to perform these duties would not be of assistance and the ALJ's failure to make the requisite findings did not prejudice the claimant, then the court will not remand for further proceedings. See Samons v. Astrue, 497 F.3d 813, 821 (8th Cir. 2007).

As an initial matter, the Commissioner indicates that he agrees with plaintiff that plaintiff's past job as fast food worker was not past relevant work because plaintiff did not perform it during the relevant fifteen-year period. The Commissioner further notes that plaintiff's restriction to unskilled work precludes performance of the position of nurse aide, which the vocational expert found was semi-skilled. (Tr. 51). The Commissioner indicates that the issue before the court is, therefore, whether the ALJ discharged his duty under Pfitzner in finding plaintiff was capable of performing past work as a housekeeper.

The Eighth Circuit's opinion in Samons v. Astrue, is particularly instructive in this case. There, a claimant made an argument identical to plaintiff's, that the ALJ failed to perform the function by function analysis. Id. The ALJ determined that the claimant retained the residual functional capacity to perform the full range of light work, so long as she was not subjected to

- 34 -

hazardous conditions or to more than moderate exposure to certain environmental conditions, but did not detail the duties of her past work as a cook, babysitter, housekeeper, or cashier. Id. The Eighth Circuit found that though the finding was deficient, the claimant was not prejudiced because her past position of cashier was defined in the Dictionary of Occupational Titles (DOT) as light work that does not expose the worker to more than a moderate level of noise or to any of the other environmental conditions mentioned in plaintiff's RFC, and the Commissioner has indicated that the DOT is a resource for determining duties of past relevant work. Id. The court thus found that, though the ALJ's findings were deficient, the claimant was not prejudiced and the court would not remand "absent unfairness or prejudice." Id. at 822.

In this case, the vocational expert testified that plaintiff's position as a housekeeper (DOT # 323.687.014) was classified by the DOT as unskilled and light. (Tr. 51, 303). The ALJ stated in as follows in his decision:

> Given the vocational expert's expertise in the field, and given that this testimony corresponds with the relevant entries in the Dictionary of Occupational Titles, the undersigned assigns great weight to this testimony and determines that the claimant is capable of performing the past relevant work of Housekeeper [...].

(Tr. 16).

The vocational expert determined that plaintiff's past work as a housekeeper was within the DOT classification 323.687.014. (Tr. 303). According to the DOT, this work is unskilled, and performed at the light level of exertion. (Tr. 51, 303). Thus, the housekeeper job as previously performed by plaintiff falls within her RFC. The undersigned has determined that the RFC formulated by the ALJ is supported by substantial evidence. Although the ALJ did not make explicit findings regarding the demands of plaintiff's past relevant work and compare those demands with her RFC, the court finds that the error did not prejudice plaintiff. See Samons, 497

F.3d at 821-22 (declining to remand matter for further proceedings on past relevant work where DOT classification made clear that past relevant work met plaintiff's RFC).

## Conclusion

Substantial evidence in the record as a whole supports the decision of the ALJ finding plaintiff not disabled because the evidence of record does not support the presence of a disabling impairment or combination of impairments. Accordingly, Judgment will be entered separately in favor of defendant in accordance with this Memorandum.

Dated this  26th   day of September, 2012.

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE